IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Sherry Privette,                          )
                                          )    Civil Action No. 6:04-1554-MBS-WMC
                      Plaintiff,          )
                                          )    **REPORT OF MAGISTRATE JUDGE**
           vs.                            )
                                          )
Jo Anne B. Barnhart,                      )
Commissioner of Social Security,          )
                                          )
                      Defendant.          )
                                          )

        This case is before the court for a report and recommendation pursuant to Local

Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District,

and Title 28, United States Code, Section 636(b)(1)(B).[1]

        The plaintiff brought this action pursuant to Section 205(g) of the Social Security

Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the

Commissioner of Social Security Administration that the plaintiff was not entitled to disability

insurance benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

        On June 5, 2002, the plaintiff filed an application for DIB alleging disability

beginning March 26, 2002. The application was denied initially and on reconsideration. On July

23, 2003, the plaintiff requested a hearing, which was held on November 19, 2003. Following

the hearing, at which the plaintiff and her attorney appeared, the administrative law judge

considered the case *de novo*, and on January 28, 2004, determined that the plaintiff was not

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

entitled to benefits. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on April 9, 2004.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1)    The claimant met the disability insured status requirements of the Act on March 26, 2002, the date the claimant stated she became unable to work, and continues to meet them through December 31, 2007.
>
> (2)    The claimant has not engaged in substantial gainful activity since March 26, 2002.
>
> (3)    The medical evidence establishes that the claimant has severe impairments of fibromyalgia and chondromalacia of the right patella; but that she does not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Regulations No. 4.
>
> (4)    The claimant's allegations of her complete inability to work are not fully credible and are not supported by the other evidence in the record.
>
> (5)    The claimant has the residual functional capacity to perform work related activities involving standing and walking six hours a day, sitting two hours a day, frequently lifting and carrying 10 pounds with a heaviest weight lifted of 20 pounds, frequently bending and stooping (20 CFR 404.1545).
>
> (6)    The claimant's past relevant work as an engineering assistant did not require the performance of work related activities precluded by the above limitations (20 CFR 404.1565).
>
> (7)    The claimant's impairments do not prevent the claimant from performing her past relevant work.
>
> (8)    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(e)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

2

**APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which

3

the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## DISCUSSION

The plaintiff contends that the ALJ erred in failing to find her disabled. Specifically, the plaintiff alleges that the ALJ erred in (1) disregarding the opinion of her treating physician; and (2) finding the plaintiff's testimony as to the severity of her condition was not credible.

The plaintiff was born on October 21, 1965, and was 38 years old at the time of the ALJ's decision in this case (Tr. 23). She is a high school graduate with some college credit

4

(Tr. 26).  Her last previous work experience was as an engineering assistant for a chemical company (Tr. 71).  Her alleged date of onset is March 26, 2002.

The plaintiff claims disability based upon chronic fibromyalgia and polyarthritis (Tr. 70).  The record shows that she began treatment with Dr. Gregory Niemer, a rheumatologist, on March 8, 2001.  The examination revealed that the plaintiff's energy was good, her sleep was "OK" and she had good grip strength.  A bone scan and MRI of the plaintiff's right knee indicated a focal area of articular cartilage loss involving the medial facet of the right patella (Tr. 124; 127).  Following his examination, Dr. Niemer diagnosed polyarthritis, which was relieved with medication (Tr. 131).  After another examination on March 21, 2001, Dr. Niemer added a diagnosis of depression due to chronic pain (Tr.  123).

On April 5, 2001, Dr. Niemer examined the plaintiff who was complaining of bilateral knee pain.  Examination revealed that there was no swelling of the knees, the plaintiff's sleep was good and her energy level was "okay," and her grip strength was good.  Dr. Niemer noted that the plaintiff was sleeping better on Neurontin and that he would inject her knees with Depomedrol and Lidocaine (Tr. 120).

At a follow-up appointment in May 17, 2001, Dr. Niemer noted that the plaintiff's knee was better after the injection, her grip strength was good, her energy was "okay" and her sleep was poor.  He also noted that the plaintiff exhibited only two out of 18 fibromyalgia trigger points (FMTP) (Tr. 119).

On June 18, 2001, the plaintiff met with Thomas Kaelin, D.O., in consultation for a possible sleep disorder.  The plaintiff reported that she had been severely tired for two years and that when she was on a higher dosage of Neurontin she did not awaken during the night.  However, at a lower dosage, which she was apparently on at the time of this appointment, the plaintiff reported that she would wake at least every 1 ½ to 2 hours.  The plaintiff also reported that she would have numbness in her legs frequently before bedtime.  Dr. Kaelin noted the "possibility of a periodic limb movement disorder."  He scheduled an overnight polysonogram (Tr. 154-155).

5

On July 31, 2001, the plaintiff was examined by Dr. Niemer with complaints of sleepiness and aching all over.  Dr. Niemer indicated that she exhibited 10/18 FMTPs.  He diagnosed the plaintiff with fibromyalgia syndrome with poor sleep and referred her for a sleep study (Tr. 118).  On August 28, 2001, Dr. Niemer noted that the plaintiff exhibited 12/18 FMTPs (Tr. 116).

A sleep study and a follow-up test done in the fall of 2001 yielded essentially normal results.  The testing did not reveal a significant amount of sleep disordered breathing.  Dr. Kaelin noted, however, that the plaintiff had been diagnosed with fibromyalgia, "which is known to cause alpha delta sleep and daytime fatigue" (Tr. 151; 153).

On March 4, 2002, the plaintiff was examined by Dr. Frank Harper, a rheumatologist, with complaints of persisting pain and fatigue.  Dr. Harper diagnosed fibromyalgia, chondromalacia of the right patella and irritable bowel syndrome, and prescribed 10 mg of Oxycontin twice a day for pain control (Tr. 210).  On March 13, 2002, the plaintiff reported to Dr. Harper that "she was unable to take Oxycontin twice daily because of excessive sedation and decided to take one per day, which helped somewhat with the pain."  Dr. Harper also noted that "she continues to have fatigue, malaise and indicates that she has significant myalgias during the day" (Tr. 208).  Dr. Harper stated that "it is my opinion, based on my experience with this patient thus far and her reliance on medications, that currently she is incapable of meaningful employment."  He asked the plaintiff to stop working and gave her a "slip" for her employer  (Tr. 208-209).  At a follow-up appointment on March 28, 2002, the plaintiff reported to Dr. Harper that she had stopped working and that the Oxycontin had helped to alleviate some of her discomfort (Tr. 205).  Dr. Harper noted that overall the plaintiff was stabilizing somewhat (Tr. 203).  On June 14, 2002, a treatment note indicated that the plaintiff had full range of motion of the joints and that her fibromyalgia discomfort was somewhat responding to drug therapy (Tr. 201).

On August 7, 2002, Dr. Harper noted that the plaintiff had full range of motion of the joints, that she had several trigger points, and that a combination of medications had been

6

helpful in stabilizing some of the plaintiff's symptoms "though she is still considerably symptomatic between visits" (Tr. 199).

On September 12, 2002, Dr. F. Keels Baker, a state agency physician, reviewed the plaintiff's records and completed a "Physical Residual Functional Capacity Assessment." Dr. Baker determined that the plaintiff was capable of occasionally lifting 20 pounds and frequently lifting 10 pounds, that she could stand and/or walk for about six hours in an eight-hour day, and that she could sit about six hours in an eight-hour day (Tr. 162).

On February 14, 2002, Dr. Judith Von, a state agency psychologist, reviewed the plaintiff's records and determined that her depression was a non-severe impairment (Tr. 181). Dr. Von also determined that the plaintiff's depression caused only mild restriction of daily living activities, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace (Tr. 191).

A treatment note dated March 19, 2003, reveals that the plaintiff reported to Dr. Harper that she had a modest degree of improvement with an increase in her medication. Dr. Harper noted that the plaintiff had a number of trigger points, but that her fibromyalgia symptoms were reasonably stable, though she was "still suffering from some very persistent fatigue and pain" (Tr. 207).

Dr. Harper again examined the plaintiff on May 12, 2003. His treatment notes indicate that the plaintiff had multiple trigger points but full range of motion of the joints. Dr. Harper noted that the plaintiff had continuing myalgias and stiffness, especially in the lower extremities, and that she was experiencing some "strange sensations," which he attributed to higher dosages of Wellbutrin. Dr. Harper reduced the plaintiff's Wellbutrin dosage and continued her other medications (Tr. 195).

On July 8, 2003, a second state agency medical consultant reviewed the plaintiff's medical records and completed a "Physical Residual Functional Capacity Assessment." The doctor concurred with the earlier assessment of Dr. Baker that the plaintiff could occasionally

7

lift 10 pounds, stand and/or walk for about six hours in an eight-hour day, and sit about six hours in an eight-hour day (Tr. 173-180).

On July 8, 2003, in which he

Dr. Harper responded to an information request on July 8, 2003, in which he stated that the plaintiff was not depressed and that she had not exhibited any functional limitation due to a mental condition (Tr. 150).

On October 23, 2003, Dr. Harper completed a Physical Capacities Evaluation form in which he indicated that the plaintiff could occasionally lift 10 pounds and frequently lift five pounds, sit for one hour and stand or walk for one hour (Tr. 212).

On February 12, 2004, Dr. Harper submitted a letter to the plaintiff's attorney outlining his treatment and prognosis for the plaintiff.  Dr. Harper stated:

> There has been some question as to whether [the plaintiff] meets the American College of Rheumatology criteria for fibromyalgia syndrome established in 1990, with 11/18 of the characteristically described trigger points. Over the past several years, she has displayed paracervical, trapezius, medial scapular border, lower back, gluteal, lateral hip and, less frequently, anterior chest wall trigger points, all tender areas located precisely as diagramed by the ACR.  As her symptoms are always bilateral, this would allow for at least 12/18 of the characteristic trigger areas.  She also has widespread pain, bilateral, upper, and lower body, and thus, fulfills the criteria for fibromyalgia syndrome without question.
>
> Physicians who care for these patients are aware of the volatility of their symptoms, that is, occasional good days allowing them to do certain activities, separated by bad days in which they are often unable to leave the bed. This is a characteristic pattern that I see in most of my patients and reflects the normal variation of control of symptoms with our best therapies.  This in no way diminishes the disabling nature of this illness, as in this patient's case; bad days generally outweigh good days and make her unreliable for meaningful or gainful employment.
>
> Given the history of her long history of chronic pain without significant improvement, having had input from three separate board-certified rheumatologists, I feel that [the plaintiff] is a bona fide treatment failure with the best local talent in Charleston and should be considered permanently disabled from meaningful or gainful employment.

(Tr. 215).

8

At the hearing, the plaintiff testified that she has to lie down because of muscle cramping and that she can only stay up for about an hour at a time (Tr. 30-31). She also testified that she has problems with her hands and with her concentration because of the medication she is taking (Tr. 35-36). She testified that she has limited daily activities and that she gets help from her family to do household chores and grocery shopping (Tr. 37 -39). The plaintiff also testified that she visits her mother two or three times a week but that she often has to lie down when she is at her mother's house (Tr. 42).

## ANALYSIS

### *Treating Physician's Opinion*

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §416.927(d)(2) (2004); *Mastro v. Apfel*, 370 F.3d 171 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. Social Security Ruling 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

As a threshold matter, the ALJ is required to determine whether a physician's opinion is "well supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with the other substantial evidence" in the record and thus entitled to controlling weight.

In discounting the opinion of Dr. Harper, the ALJ noted that his treatment notes were not consistent with his opinion that the plaintiff is disabled. Specifically, the ALJ found that

Dr. Harper did not indicate that pain was present in at least 11 of the 18 trigger points and that Dr. Harper had consistently found that the plaintiff had full range of motion of all joints (Tr. 17).

Fibromyalgia is a musculoskeletal disorder which causes severe pain in the muscles, ligaments and tendons. *See Conrad v. Continental Cas. Co*, 232 F.Supp.2d 600 (E.D.N.C. 2002). Courts have recognized that the pain suffered by those diagnosed with fibromyalgia can be disabling. *See e.g., Ward v. Apfel*, 65 F.Supp.2d 1208 (D.Kan.1999). However, the symptoms of fibromyalgia are entirely subjective, and there are no laboratory tests to identify its presence or severity.[2] Subjective symptoms must be evaluated with due consideration of credibility, motivation, and medical evidence of impairment. Other factors the court considers in evaluating whether pain is disabling are attempts to find relief from pain, willingness to try treatment, regular contact with a doctor, and daily activities. *Luna v. Bowen*, 834 F.2d 161, 165-166 (10th Cir. 1987).

In this case, substantial evidence does not support the determination of the ALJ that the opinion of Dr. Harper is not entitled to controlling weight. In fact, not only was there no persuasive contradictory evidence, there is substantial supportive evidence of Dr. Harper's opinion.

As noted above, Dr. Harper has been the plaintiff's treating specialist for several years and he has examined her on a regular basis. His treatment notes over this period document that the plaintiff has widespread pain, sleep disorder, cognitive dysfunction, and irritable bowel syndrome, all of which are consistent with the diagnosis of fibromyalgia. Moreover, his examination revealed that the plaintiff had the requisite number of trigger points for a fibromyalgia diagnosis. The ALJ mistakenly overlooked the fact that the six or seven trigger points noted by Dr. Harper were bilateral, and thus involved 12 to 14 of the trigger point

---

[2]Currently, no objective findings or lab test for fibromyalgia are commonly accepted in the medical community. The most widely accepted criteria for the diagnosis of fibromyalgia are the American College of Rheumatology Criteria for the Classification of Fibromyalgia. There are two criteria: a history of widespread pain, as defined in the criteria, and pain in 11 of 18 tender (or "trigger") point sites when pressed or "palpated" by a physician. The criteria state that for a tender point to be considered "positive," the patient must say the palpation was painful.

areas over the course of her treatment.  The record also reveals that Dr. Harper's opinion is supported by the findings of Dr. Niemer, also a board-certified rheumatologist.

The ALJ relies on the opinions of state agency medical consultants in support of his conclusion that the plaintiff is not disabled (Tr. 17).  These doctors, however, only reviewed the plaintiff's medical records and they cite no specific facts in support of their opinions.

Furthermore, the plaintiff's own testimony is consistent with Dr. Harper's opinion. She testified that her daily activities are severely limited and that she has to lie down a lot because of the pain and cramping (Tr. 30).  She does not sleep well and is in constant discomfort.  Her husband and sons do most of the housework  and her 15-year-old son goes with her to do grocery shopping (Tr. 38-39).  The plaintiff also testified that she is unable to sit or stand for longer than an hour (Tr. 33-34).  In addition, the plaintiff testified that she loses her concentration and she forgets things easily (Tr. 35-36).

As Dr. Harper's opinion is not inconsistent with other substantial evidence in the record, the ALJ erred in failing to give Dr. Harper's opinion controlling weight.

***Plaintiff's Credibility***

A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence.  20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).

In making his credibility determination, the ALJ here stated:

> The claimant testified that she folds laundry, drives short distances several times a week, and visits her mother.  Such activities clearly indicate that the claimant is capable of carrying out many activities of normal daily living and are inconsistent with the degree of dysfunction alleged.  She also has a five year old child.  Taking

> care of a young child could require a level of activity very similar to performing many work-related activities.

(Tr. 17). The ALJ clearly did not specify in detail the reasons for his finding that the plaintiff was not credible and that her limitations were not as great as she testified. In fact, the plaintiff's testimony reveals that her activities of daily living are severely limited. She testified that for most household tasks she requires assistance from her husband or son (Tr. 37-39). She visits her mother a couple of times a week, but she testified that often when she is at her mother's house she has to lie down (Tr. 42). She also testified that she is unable to do many of the activities, such as archery, hunting and traveling, that she used to enjoy doing with her family (Tr. 42-43). Additionally, the care of a five-year-old does not necessarily require an activity level similar to work-related activities. The symptoms and limitations which the plaintiff testified she experiences are reasonably consistent with the medical evidence and the conditions from which she suffers. Accordingly, the ALJ erred in finding the plaintiff's testimony as to her limitations to be not credible, as the testimony is not inconsistent with the medical and other evidence.

## CONCLUSION AND RECOMMENDATION

The record does not contain substantial evidence supporting the Commissioner's decision denying coverage under the correct legal standard, and reopening the record for more evidence would serve no purpose. *See Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974). Therefore, based upon the foregoing, it is recommended that the Commissioner's decision denying the plaintiff's application be reversed pursuant to sentence four of 42 U.S.C. §405(g) and that the plaintiff be awarded benefits.

s/William M. Catoe
United States Magistrate Judge

June 28, 2005

Greenville, South Carolina

12